UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| **CRYSTAL SNOWDEN,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,**<br><br>    **Defendant.** | **CIVIL ACTION NO. 5:21-144-KKC**<br><br><br>**OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

The matter before the Court is a claim under 29 U.S.C. § 1132(a)(1)(B), the Employee Retirement Income Security Act of 1974 (ERISA), for the denial of long-term disability benefits. Both parties have moved for judgment on the administrative record and the matter, having been fully briefed, is now ripe for review. For the following reasons, the Court will enter judgment for defendant Hartford Life and Accident Insurance Company (Hartford).

I.

Hartford insured plaintiff Crystal Snowden through her employer where she worked in clerical support at a medical clinic. On July 8, 2019, Snowden was treated for shortness of breath and thigh pain. While in the hospital, Snowden was seen by a rheumatologist and neurologist and received various tests—all of which came back unremarkable. She was discharged after five days with no noted restrictions and no etiology for her diagnoses, which were musculoskeletal thigh pain and shortness of breath upon exertion. Five days after discharge, Snowden filed a claim for

short-term disability benefits with Hartford having already been approved for FMLA leave as of July 8. Hartford approved the claim.

From the time of this hospital visit through the end of 2019, Snowden saw primary care provider Dr. Paul Karkorian numerous times. She saw a handful of specialists, including a cardiologist, a rheumatologist, and a neurologist. Dr. Karkorian and the specialists ordered various tests—all of which came back normal. Throughout this period, Snowden consistently complained of muscle weakness, shortness of breath, and muscle pain. She exhibited limited range of motion and an abnormal gait. Other than this, all examinations and tests were normal with no distress. Apart from a cardiologist's diagnosis on two occasions of abnormal ECG, precordial pain, palpitations, and vagal bradycardia (all of which were accompanied by notes of a normal examination with no distress), the consistent diagnosis throughout this period was muscular weakness, shortness of breath, and pain.

Snowden filed a claim for long-term disability benefits on October 2, 2019. (AR 350)[1]. Dr. Karkorian's opinion was that Snowden was unable to work and that he supported her long-term claim. To assist in its determination, Hartford sought an independent medical review from Dr. Rafid Kakel. On November 14, 2019, Dr. Kakel wrote that the records he reviewed did not support work restrictions or limitations. (AR 1095). Dr. Kakel reviewed some additional records and a month later wrote that his opinion had not changed. Hartford denied Snowden's claim for long-term disability on December 17, 2019. Snowden appealed on June 12, 2020. From then until the end of the year, Snowden submitted additional medical records and Hartford sought a new independent medical review from Dr. Arousiak Maraian. On August 31, 2020, Dr. Maraian concluded that Snowden's primary care physician Dr. Karkorian's opinion was not supported by

---

[1] All citations to the administrative record will be to the PAGE ID# of the exhibits attached in DEs 14 and 15.

the records and that there was "no medical or neurological evidence in the records that the claimant is unable to work full time." (AR 448).

On December 23, 2020, Hartford completed its appeal review and upheld the denial. (AR 274). Hartford stated that its decision was independent of the original denial and that a review had concluded that "the weight of the clinical evidence currently available for review finds clinical support for an inability to work for the period of 07/08/2019 through 07/13/2019, but not beyond and throughout the Policy's Elimination Period." (AR 278).

II.

Because the plan gives Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy" (AR 95), the parties agree (*see* DE 12 at 2) that the Court should review Hartford's denial of benefits under the "arbitrary and capricious" standard. The arbitrary and capricious standard is "the least demanding form of judicial review of administrative action." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011) (internal citation omitted). "A plan administrator's decision will not be deemed arbitrary or capricious so long as it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Judge v. Metropolitan Life Ins. Co.*, 710 F.3d 651, 657 (6th Cir. 2013) (internal quotations omitted). "When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard, we are required to consider only the facts known to the plan administrator at the time he made his decision." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). The arbitrary and capricious standard extends to this Court's review of the plan administrator's interpretations of the plan itself, *Kovach v. Zurich American Ins. Co.*, 587 F.3d 323, 328 (6th Cir. 2009), as well as the plan

administrator's factual determinations. *See Gatlin v. Nat'l Healthcare Corp.*, 16 F. App'x 283, 288 (6th Cir. 2001).

Ultimately, under this standard of review, a court must uphold the plan administrator's decision "if it is the result of a deliberate, principled reasoning process and is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006). "Put another way, 'when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.'" *Pflaum v. UNUM Provident Corp.*, 175 F. App'x 7, 9 (6th Cir. 2006) (quoting *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). Though the Court's review under the arbitrary and capricious standard is "not without some teeth," it is still extremely deferential. *See McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014) ("An 'extremely deferential review,' to be true to its purpose, must actually honor an extreme level of deference to the administrative decision.").

Snowden also argues that Hartford had an inherent conflict of interest because it both evaluates and pays the benefits for claims under the ERISA plan. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). Though Hartford denies that any structural conflict tainted its decision in any way, there does not appear to be any dispute that Hartford performed both roles here. Therefore, the Court will consider Hartford's inherent conflict of interest as one factor in reviewing the reasonableness of the decision. *Hogan v. Life Ins. Co. of N. Am.*, 521 F. App'x 410, 417 (6th Cir. 2013).

III.

Snowden presents three main arguments that Hartford's denial of benefits was neither the result of a deliberate reasoning process nor supported by substantial evidence. First, she argues that Hartford ignored favorable evidence from her treating physicians and from a Functional

Capacity Evaluation (FCE). Second, she argues that Hartford's reliance on file-only reviews was arbitrary and capricious for a myriad of reasons. Third, she argues that Hartford failed to conduct a vocational analysis. Underlying all of Snowden's arguments is the assertion that, in weighing records and ultimately denying her benefits claim, Hartford improperly required her to show some definite diagnosis or anatomic explanation for her subjective symptoms—and even under that improper burden, she offered objective proof of an anatomic explanation through the FCE.

The bulk of Snowden's evidence of a qualifying disability comes from her treating physician Dr. Karkorian. In a letter dated November 1, 2019, Dr. Karkorian stated he supported disability because Snowden was still having myalgia, muscle weakness, and shortness of breath on exertion and noted there was no treatment plan yet because Snowden was still in the diagnosis/investigation phase. (AR 2390-91). These diagnoses were consistent with ones made during and shortly after Snowden's July 2019 hospital stay and noted by Dr. Karkorian in records supporting Snowden's short-term disability. (*See* AR 2448).

On November 8, 2019, Dr. Karkorian stated he supported long-term disability with a diagnosis of myopathy due to Sjogren's disease. (AR 2393). Dr. Karkorian's opinion remained the same throughout the benefits appeal process and he provided various records to that end. On October 8, 2020, Dr. Karkorian told Dr. Maraian that Snowden still "had gradual muscle weakness and pain in right thigh and developed dyspnea on exertion" but that "all the tests were negative, and she was to have a muscle biopsy, but this did not happen." (AR 409-10). Dr. Karkorian further explained that Snowden had not seen a second neuromuscular specialist but had seen a pulmonologist who did not find any abnormality. (*Id.*). Dr. Krikorian said that there was no muscle atrophy or fasciculation but the motor power in her legs was 3/5 and strength in the arms was

normal. He said that "the patient gasps for air and coughs when she walks a short distance" but "as of now no etiology has been found for her symptoms." (AR 410).

Snowden's other primary evidence of disability comes from an FCE dated November 4, 2020. The FCE, which tested Snowden's ability to perform a variety of work-related tasks, concluded:

> Overall Level of Work: Unable to perform at Sedentary Level. Based on this evaluation the client cannot perform the full range of Sedentary work functions as defined by the US Dept. of Labor in the DOT. This is due to difficulties performing the dynamic, strength demands of work. The client demonstrated difficulty performing the Sedentary level of work due to limitations with Lifting to Waist, Lifting to Eye Level, Bilateral Carrying, Unilateral Carrying, Pushing, and Pulling tasks. However, the client has adequate sitting, standing, and walking ability to perform some Sedentary work tasks; Therefore, if the materials handling abilities can be accommodated for, the client would be able to perform some Sedentary work functions

(AR 389). Specifically, the report noted that some of the factors underlying Snowden's performance dysfunction were decreased muscle strength in the trunk and bilateral lower and upper extremities, decreased range of motion, decreased muscle flexibility in low back and right hip, pain, and generalized fatigue. (AR 392). The report went on to say, however, that "if the above noted adaptations can be made, the client can tolerate the Sedentary level of work for 8 hours." (AR 389).

Even if there is evidence in the record to support Snowden's claims, "under the substantial evidence standard, we ask only whether [Hartford's] decision was within the realm of reasonability; if it was, we defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Fenwick v. Hartford Life & Accident Ins. Co.*, 841 F. App'x 847, 857 (6th Cir. 2021) (internal quotations removed). "Substantial evidence" is evidence that a reasonable mind might accept as sufficient to support a conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (quoting *Foster v. Halter*, 279 F.3d 348, 353 (6th

Cir. 2001)). Thus, if there is reasonably sufficient evidence to support the denial of benefits, the Court must defer to that decision.

There is substantial evidence in the record to support the administrator's decision to deny Snowden's claim for long-term disability benefits. Dr. Kakel, the board-certified occupational medicine doctor who performed the first independent medical review for Hartford in November, 2019, concluded that "within reasonable degree of medical probability and certainty, and purely from a physical stand point, no restrictions or limitations are necessary or supported by the provided records. Multiple diagnostic tests over extended periods of time did not show any significant abnormality to support any functional limitation." (AR 1095). Kakel further stated that "in my medical opinion, there [are] no limitations in the number of hours per day and days per week [Snowden] is capable of working." (*Id.*) Dr. Kakel reviewed additional medical records and on December 13, 2019 provided that "my opinion stays the same" and that "there is no new information to support any functional limitation." (AR 1025).

Dr. Maraian, the board-certified doctor of neurology and internal medicine who performed the second peer review following Snowden's appeal of the denial of benefits, came to the same conclusion. In concluding his peer review dated August 31, 2020, Maraian stated "there is no medical or neurological evidence in the records that the claimant is unable to work full time." (AR 448). Specifically, "from 7/14/19 onward, no restrictions or limitations are supported in relation to a medical (non-psychiatric) or neurological conditions. Claimant's self-reported symptoms were inconsistent and did not correlate with examination findings." (*Id.*).

A few days later, in an addendum dated September 1, 2020, Dr. Maraian noted that he had talked to neurologist Dr. Everman and that it did not change his determination in the August 31st peer review. (AR 436). Dr. Maraian reviewed additional records and on October 19 penned another

addendum stating that "the additional records and the teleconference did not alter the previous determination." (AR 409). And on November 23, 2020, Dr. Maraian provided another addendum for which he reviewed additional medical records, letters from Snowden's friends and family, and the November 4, 2019 FCE report. Dr. Maraian concluded that "additional records do not contain any new symptoms, findings, tests, or diagnoses which might change the previous conclusions. The new set of records do not document a medical or neurological diagnosis which caused the claimant impairment of function." (AR 364).

Further, the records and reports that Dr. Kakel and Dr. Maraian reviewed as part of their independent reviews—reports from the various specialists that saw Snowden throughout the period in question—could reasonably support the administrator's ultimate decision. Cardiologist Dr. Larry Breeding told Dr. Kakel that all cardiac testing was normal, he could not find any abnormality whatsoever, and that from a heart standpoint, she does not qualify for any disability. (AR 1094). Neurologist Dr. Ima Ebong likewise told Dr. Kakel that Snowden was not totally disabled and "she can do whatever work she was doing before." (*Id.*).

Still, Snowden argues that Hartford ignored or otherwise failed to give weight to the opinions of her treating physician Dr. Karkorian, the results of the FCE, and corroborating statements of Snowden and her family that all show that she suffers from disabling symptoms that have been consistently assessed. She claims that Hartford discounted these opinions without a reasonable explanation, therefore the denial was arbitrary. But the record does not support the assertion that Hartford ignored any of this evidence, only that Hartford viewed it in light of opposing evidence and found the latter more persuasive. "Unlike the mandatory deference accorded to treating physicians in Social Security cases . . . in the ERISA context . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a

claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Evans v. Unumprovident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).

For example, Dr. Maraian's initial medical record review gives a detailed history of Snowden's symptoms, doctor visits, and testing. The review encompassed diagnostic studies from October 2016 through May 2020, laboratory tests from October 2018 through July 2020, the treatment records of Dr. Karkorian from May 2019 through February 2020, hospital admissions, the records of cardiologist Dr. Breeding, the records of neurologists Dr. Ebong and Dr. Everman, various reports of physical therapists, and other visits to rheumatologists and nurse practitioners in cardiology and neurology. (AR 442). Dr. Maraian explained precisely why he disagreed with Dr. Karkorian as to Snowden's status:

> PCP Dr. Karkorian signed a disability form on 11/1/19 stating that the claimant was not able to work because of myalgia, shortness of breath and muscle weakness. PCP Dr. Karkorian wrote a letter on 11/8/19 stating that he supported the claimant for long term disability for diagnosis of myopathy due to Sjogren's disease. There are no disability form or letters from the specialists advising restrictions or limitations. The PCP has advised disability based on claimant's complaints and on an unsupported diagnosis. Records provided do not show any evidence of myopathy on examination, on EMG/NCS or on MRI of muscles. Diagnoses of myopathy or Sjogren's disease were not made by the rheumatologist or the neurologist. The attending physician's opinion is not supported by the documentation reviewed.

(AR 448).

Further, the record does not support the claim that the FCE was ignored during the administrator's analysis. Dr. Maraian specifically reviewed the FCE and accounted for it in his November 23, 2020 peer review addendum. Maraian noted that "additional records do not alter the previous determination because no new clinical information is provided. The records consist of letters from the claimant and her family and FCE which showed that claimant could work 8

hours per day with restrictions and limitations." (AR 364). Though not the most detailed analysis, this is an accurate summation of the FCE report (*See* AR 389). Moreover, Hartford provided a specific reason why the FCE was given less weight than other evidence in the record:

> We also acknowledge the results of the 11/04/2020 FCE; however, this was completed more than one year status post disability and would not accurately reflect your client's functionality beginning on her date of disability, that being 07/08/2019 throughout and beyond the Policy's 90 day Elimination Period, and beyond through present. Though your client's Employer may have accommodated your client prior to her ceasing work completely beginning 07/08/2019, the Policy is clear in defining Disability, meaning your client must be prevented from performing one or more of the Essential Duties of her Occupation as a Clerical Support Team Leader as of the reported date of disability. Per the Job Description provided and the medical evidence submitted, our position is that the medical evidence does not indicate a severity of your client's condition, via level of treatment and/or examination/test results that would indicate restrictions/limitations preventing your client from performing the Essential Duties of her occupation.

(AR 279).

Snowden further argues that Hartford did not exhibit a deliberate reasoning process because the backbone of its denial—the file-only reviews—were insufficient. She argues that Hartford made credibility assessments without conducting an in-person examination. While a failure to conduct a physical examination "may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination," the reliance on file review here was not arbitrary and capricious. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005).

Generally, reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly. *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013). The Sixth Circuit has deviated from that rule and found fault with file-only reviews when the file reviewer concluded that the claimant was not credible without having actually examined them, as in *Bennett v. Kemper Nat'l Servs., Inc.*, or when "the plan administrator, without any reasoning, credit[ed] the file reviewer's opinion over that of a treating physician." *Judge*, 710 F.3d at 663 (citing *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006). Even then, the plan

administrator's decision to conduct a file review rather than a physical exam is just "one more factor to consider in our overall assessment of whether [they] acted in an arbitrary and capricious fashion" *Calvert*, 409 F.3d at 296.

Snowden cites both *Bennett* and *Elliott*, as well as *Evans v. UnumProvident Corp.*, *Smith v. Continental Casualty Co.*, and *Shaw v. AT&T Umbrella Benefit Plan No. 1* in support of her argument that Hartford's file-only review was improper. But the file reviews in those cases suffered from deficiencies that are simply not present here. In *Bennett*, neither file-review in question made any mention of the SSA's determination that Bennett was disabled and never attempted to explain why they disagreed with that analysis. 514 F.3d 547, 554 (6th Cir. 2008). Here, the majority of the doctors who saw and reviewed Snowden's medical records concluded that she was able to work. Dr. Maraian's medical review took Dr. Karkorian's opinion into account and explained why he disagreed with it. In *Elliott*, the court took issue with a file review because the administrator gave it more weight for "no apparent reason." *Elliott*, 473 F.3d at 621. The court stated that "a plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion." *Id.* (citing *Evans*, 434 F.3d at 877 (6th Cir. 2006)). Here, Hartford did not fail to give ample reasons for rejecting Dr. Karkorian's opinion.

Likewise in *Evans*, the court upheld a district court's determination that a plan administrator acted arbitrarily in part because there were factual inaccuracies in the file reviews and that they "categorically" dismissed the treating physician's opinion without stating why. 434 F.3d at 880. In *Smith*, the file reviewer did not note the data he reviewed in reaching his decisions and made only conclusory statements about the subjectivity of the patient's pain. 450 F.3d 253, 263 (6th Cir. 2006). And in *Shaw*, the plan administrator summarily rejected and in some cases ignored the claimant's evidence of disability without offering any evidence to contradict it, among

various other problems with the reasoning process. Hartford's process here does not suffer from the same deficiencies.

Additionally, Snowden takes issue with Hartford's decision not to conduct a vocational analysis. She argues that Hartford never accurately considered her true job functions because, "while her occupation did require sitting, it had additional lifting and physical exertional requirements that exceed the strength requirements of sedentary work." (DE 18-1 at 23-24). But the Plan specifically stated that the occupation to be analyzed was the occupation "as it is recognized in the general workplace, that [Snowden was] routinely performing prior to becoming Disabled. Your Occupation does not mean the specific job [Snowden was] performing for a specific employer or at a specific location." (AR 127).

None of the cases Snowden cites support the proposition that Hartford acted arbitrarily when it analyzed her claim. *Javery* involved one doctor's failure to consider the intellectual aspects of a claimant's job as it was a significant aspect of the role. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 702 (6th Cir. 2014). Second, *Elliott* did not deal with any discrepancies between the claimant's general occupational duties and their employer-specific duties. *See Elliott*, 473 F.3d at 618-20. Third, Gilchrest involved a claimant whose job title and description bore very little resemblance to the duties he actually performed. *Gilchrest v. Unum Life Ins. Co. of Am.*, 255 F. App'x 38, 43 (6th Cir. 2007). The court even noted that "the fact that Gilchrest's work actually required lifting of more than 25 pounds is not dispositive, as it is conceivable that an Assistant Site Manager could be required by a particular employer to also perform tasks requiring medium or heavy lifting. Rather, this was only part of the evidence demonstrating that Gilchrest was not routinely performing the material and substantial duties of the occupation of 'Assistant Site Manager' as that occupation is performed in

the national economy." *Id.* at 43-44. In short, Snowden does not provide anything that would suggest Hartford acted improperly when it considered her occupation as per the policy and Snowden's general duties.

Finally, Snowden consistently takes issue with the burden of disability that she claims Hartford wrongly required. Snowden asserts that Hartford denied her claim because she could not prove the etiology of her symptoms. Snowden cites *Huffaker v. Metro. Life Ins. Co.* for the assertion that "some medical conditions may be difficult to diagnose, and that fact alone does not allow an administrator to deny a claim. Rather, an insurer should request evidence of disability as opposed to evidence of diagnosis." (DE 18-1 at 22).

Though Hartford did use the language "unsupported diagnosis" in its denial language (*see, e.g.*, AR 277), Hartford clearly found that there was not enough evidence of a *disability*, as defined by the policy and interpreted by the policy provider, to support long-term benefits. Hartford noted there were diagnoses here (myopathy due to Sjogren's disease, myalgia, shortness of breath, etc), but that no restrictions or limitations were supported and that Snowden's symptoms "were inconsistent and did not correlate with examination findings." (*Id.*). Further, contrary to primary care physician Dr. Karkorian's analysis, the record did not contain any disability forms or letters from specialists advising restrictions or limitations. Hartford noted that none of the additional medical documentation provided after its initial denial supported the inability to work beyond the policy's elimination period. Hartford stated that Snowden's "symptoms must also be supported by the level of treatment, documented observed symptoms and the exam results in the clinical records." (AR 279). A plan administrator can reasonably interpret a plan to require objective evidence of disability, even if the plan does not explicitly require such. *Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 500 (6th Cir. 2008) (citing *Cooper v. Life Ins. Co. of N. America*, 486 F.3d

157, 166 (6th Cir. 2007)). The record shows that Hartford did not simply deny Snowden's claim because she could not present evidence of specific diagnosis, but instead denied the claim because she failed to present sufficient objective evidence of a disability, as required by the plan, in light of the medical opinions of her treating specialists and the independent medical reviewers.

The question under the Court's deferential review is not whether Snowden presented any evidence of her disability. Nor is it the job of the Court to weigh the medical records before it and make its own determination as to whether Snowden should or should not have been granted long term benefits. The Court asks only whether Hartford's denial was reasonable based on the evidence that supports its conclusion. Ultimately, the "issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002). Here, there is a substantial amount of evidence in the record to support the plan administrator's ultimate decision to deny benefits. Because it is possible to offer a reasoned explanation, based on the evidence, for denial, that outcome is not arbitrary and capricious. *See Pflaum*, 175 F. App'x at 9. Accordingly, the Court hereby ORDERS that Snowden's motion for judgment reversing the administrative decision (DE 18) is DENIED and Hartford's motion for judgment (DE 19) is GRANTED.

This 21st day of March, 2023.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY